## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JONATHON MESKAUSKAS,

       **Plaintiff,**

vs.

JASON B. BUSKOHL, C/O WILLIS, C/O
BERRY, SGT. MACIURA, LT.
REICHART, C/O SPILLER, C/O HECHT,
ROBERT H. HUGHES, JASON N. HART,
RICHARD HARRINGTON, DR.,
TROST, WEXFORD HEALTH
SERVICES, C/O JOHN DOE
DEFENDANT 5, C/O JOHN DOE
DEFENDANT 12, NURSE JANE DOE 16,
C/O JOHN DOE 19,

       **Defendants.**

)
)
)
)
)
)
)
)
)
)

Case No.   15-cv-431-MJR-SCW

### REPORT AND RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

#### INTRODUCTION

Pursuant to 42 U.S.C. § 1983, *pro se* Plaintiff Jonathon Meskauskas, currently housed at Stateville Correctional Center, filed this complaint against several individuals at Menard Correctional Center for violations of his constitutional rights while he was housed at that prison.  Specifically, Plaintiff alleges that: Defendant Buskohl used excessive force on him on February 3, 2014 (Count 1); Willis, Berry, Maciura, and C/O John Doe #5 failed to protect or intervene during the assault (Count 2); Defendants Reichart and Spiller used excessive force in a separate incident on February 3, 2014

(Count 3); Defendant Hecht failed to protect and intervene during that assault (Count 4); Reichert and Spiller assault was in retaliation for Plaintiff reporting Buskohl's misconduct (Count 5); Defendants Hughes, Hart, Harrington, and John Doe #12 denied Plaintiff's due process in connection with a disciplinary ticket and hearing related to the February 3, 2014 incident (Count 6); Nurse Jane Doe # 16 and Dr. Trost were deliberately indifferent to Plaintiff's medical needs following the two assaults (Count 8); Wexford Health Sources, Inc. was deliberately indifferent in instituting a policy that elevated the cost of care over quality of care (Count 9); and John Doe #19 subjected Plaintiff to unconstitutional conditions of confinement while at Menard (Count 10).

This matter is before the Court on Defendants Dr. John Trost's and Wexford Health Sources, Inc.'s motion for summary judgment (Doc. 60). Defendants argue that they are entitled to summary judgment because Plaintiff did not properly exhaust his administrative remedies against them. Plaintiff filed a response (Doc. 64) in opposition to the motion. The matter has now been referred to United States Magistrate Judge Stephen C. Williams by United States Chief Judge Michael J. Reagan pursuant to **28 U.S.C. §§ 636(b)(1)(B) and (c)**, **Federal Rule of Civil Procedure 72(b)**, and **Local Rule 72.1(a)**. The undersigned held an evidentiary hearing on the matter on June 23, 2016. Based on the following, it is **RECOMMENDED** that the Court **DENY** the motion for summary judgment (Doc. 60).

F<small>INDINGS OF</small> F<small>ACT</small>

**A. Factual Background**

Plaintiff filed his complaint alleging various constitutional violations stemming from an incident which occurred on February 3, 2014.   As narrowed by the threshold order, the facts relevant to the current dispositive motion are as follows:

Plaintiff's complaint alleges that while he was eating lunch on the day in question, a fight broke out between two inmates (Doc. 5, p. 2).   An officer in a nearby tower fired his weapon and Plaintiff responded by dropping to the ground in a non-combative position (*Id.*).   Several officers rushed into the dining room and Defendant Buskohl sprayed pepper spray directly in Plaintiff's eyes (*Id.*).   Plaintiff started coughing, gasping for air, and rolling around on the ground.   Buskohl kicked Plaintiff in his nose causing it to "bust and bleed profusely" (*Id.*).   The other responding officers, including Willis, Berry, Maciura, and John Doe #5 failed to intervene (*Id.* at p. 2-3).

After the incident, Plaintiff was taken to the healthcare unit where he was seen by a nurse and Defendant Trost (Doc. 5, p. 3).   While the nurse cleaned the pepper spray from his eyes, Dr. Trost did not respond to Plaintiff's complaints of pain (*Id.* at p. 3). After finishing in healthcare, Plaintiff was taken to be interviewed by Defendants Hecht and Spiller (*Id.*).   Plaintiff denied involvement in the fight and reported that Defendant Buskohl assaulted him (*Id.*).   Defendant Reichert entered the room and berated Plaintiff for failing to take responsibility for his involvement in the fight.   He then struck

Plaintiff in the nose, causing his previous injury to reopen (*Id.*).   Reichert and Spiller then grabbed Plaintiff by his arms and slammed him into a desk, then dragged him over to a metal bar and slammed his head into the bar (*Id.*).   Spiller then kicked Plaintiff in the back of his thigh (*Id.*).   Hecket did not intervene during the incident.

Plaintiff was then seen by Nurse Lane who placed gauze on his nose and diagnosed him with a cut on his head (Doc. 5, p. 3).   She noted a lump on his head and recommended an x-ray for the injury (*Id.*).   Plaintiff was taken back to the healthcare unit where he was again seen by a nurse and Dr. Trost (Doc. 5, p. 4).   Plaintiff was bleeding profusely but Trost denied him an x-ray and pain medication (*Id.*).   Plaintiff was given a tetanus shot but nothing else (*Id.*).   Plaintiff believes that his nose was broken but he never received a formal diagnosis (*Id.*).   Plaintiff alleges that he was denied both an x-ray and medication as part of Wexford's policy to elevate cost over care.   According to Plaintiff, Wexford hires incompetent health care providers who provide subpar treatment in order to save Wexford money (*Id.*).

## B.  Procedural Background

Subsequent to Plaintiff filing his complaint, Defendants John Trost and Wexford Health Sources, Inc. filed a motion for summary judgment on the issue of exhaustion of administrative remedies.   Defendants argued that Plaintiff failed to exhaust his administrative remedies against them because the one grievance he filed related to his claims was deemed untimely by the ARB.   Defendants acknowledge that Plaintiff filed a grievance directly to the ARB on May 7, 2014 (Doc. 61-10, p. 1-2).   That grievance

alleged that he was assaulted on February 3, 2014 while at Menard.  The grievance states that after the incident in the dining room he was taken to the healthcare unit and was seen by a nurse and Defendant Trost (*Id.* at p. 2).  Although he was bleeding profusely and complained of pain, Trost never prescribed him pain medication (*Id.*). Plaintiff's grievance then discusses the second assault by Spiller and Reichert and states that after that assault he was taken back to the healthcare unit where he was again seen by a nurse and Trost.   Again Plaintiff's nose was bleeding and he was dizzy.   He told Trost that he was in pain and thought his nose was broken (*Id.*).   Plaintiff told Trost that he thought he needed an x-ray of his head and nose, but Trost refused the x-ray and also denied Plaintiff pain medication (*Id.*).

The bottom of page two of the grievance indicates that it goes on to a page three, but Defendants have only provided two pages of the May 7, 2014 grievance.   Plaintiff's complaint contains the entirety of the grievance that he alleges he sent to the ARB while at Pontiac (Doc. 1-1, p. 25-34)   The grievance was received by the ARB on May 12, 2014 (Doc. 61-11).   The grievance was denied as untimely with a note that Menard had no record of grievances filed by Plaintiff regarding the incident (*Id.*).   Defendants argue that since Plaintiff filed an untimely grievance directly to the ARB and that Menard had no record of any other grievances related to this incident, Plaintiff did not properly exhaust his administrative remedies.

However, Plaintiff argues that he submitted numerous grievances while still housed at Menard Correctional Center in an effort to exhaust his administrative

remedies.   Plaintiff argues that he first filed an emergency grievance about his medical treatment on February 14, 2011 (Doc. 64, p. 4; Doc. 1, p. 12).   This grievance is attached to Plaintiff's complaint (Doc. 1-1, p. 3).   The grievance alleges that he went to the healthcare unit twice on February 3, 2014 for a "busted nose" and C/O spray in his eyes and was seen by an unknown nurse and Dr. Trost (Doc. 1-1, p. 3).   Plaintiff indicates that this grievance is a handwritten copy of his grievance and the he never received a response to the grievance (Doc. 64, p. 4).

Plaintiff next indicates that he submitted a second and third grievance on February 20, 2014 through the institutional mail about staff conduct and disciplinary proceedings (Doc. 64, p. 4).   The grievance, which Plaintiff also attached to his complaint, indicates that he was seen by Dr. Trost after the February 3, 2014 incident in the chow hall and that he told Trost he was in pain but Trost did not do anything (Doc. 1-1, p. 5-13).   The grievance also alleges that Trost later refused Plaintiff an x-ray and pain medication when he was seen by Trost a second time on February 3, 2014 (*Id.*). Plaintiff never received a response to that grievance.

Plaintiff next argues that he submitted another grievance on March 11, 2014, which is also attached to his complaint (Doc. 1-1, p. 14-22).   Plaintiff indicates that it is exactly the same as the grievance he wrote on February 20, 2014, but he marked this grievance as an emergency (Doc. 1-1, p. 14).   A review of the March 11, 2014 grievance shows it to be an exact copy of the February 20, 2014 grievance, except for the different dates.   Plaintiff indicates in his motion that he submitted this grievance through U.S.

Postal and has attached an authorization of postage as evidence that it was sent (Doc. 1-1, p. 23).

In April 2014, Plaintiff was transferred to Pontiac.  Plaintiff then submitted a grievance directly to the ARB on May 7, 2014 regarding the events which occurred at Menard on February 3, 2014.   The grievance was received by the ARB on May 12, 2014 (Doc. 1-1, p. 25).   Plaintiff's grievance attached to his complaint, which he sent to the ARB, is significantly longer than the grievance produced by Defendants (Doc. 61-10, p. 1-2; Doc. 1-1, p. 25-34).   Plaintiff's submitted grievance includes a note that the 8 page grievance is a copy of a grievance that he filed at Menard but received no response from the institution (Doc. 1-1, p. 32-34).   The grievance was returned to Plaintiff by the ARB as untimely (Doc. 1-2, p. 1).   The ARB also noted that Menard had no record of any grievances filed by Plaintiff (*Id*.).

As there was a dispute of fact as to whether Plaintiff sought to timely file grievances while he was housed at Menard Correctional Center, the Court set the matter for an evidentiary hearing.

### C. *Pavey* Hearing

On June 23, 2016, the Court held a hearing to determine whether Plaintiff properly sought to submit grievances while at Menard Correctional Center on his claims related to Trost and Wexford, but was thwarted in doing so.   At the hearing, counsel for the Defendants offered into evidence a return from the ARB for a grievance dated May 5, 2014.   The form indicates that a grievance was received on August 20, 2014 and that any

grievance now submitted for issues prior to March 2014 would be untimely.   However, the undersigned noted that this grievance was submitted to the ARB after Plaintiff had transferred from Menard Correctional Center and the issue before the Court was whether Plaintiff sought to submit timely grievances at Menard but was thwarted. Thus whether Plaintiff later submitted grievances directly to the ARB is not pertinent to the issues before the Court.

Defendants also sought to submit Plaintiff's cumulative counseling summary while at Menard.   Defense counsel pointed out that the cumulative counseling summary showed that Plaintiff did receive grievances in October 2012, but that entry indicates that he was given two grievances, suggesting he received blank grievance forms.   Further, Plaintiff's counsel at the time was Junette Bennett and he was not housed in segregation at Menard during that time period.   During the relevant time period when Plaintiff alleges that he submitted grievances, February and March 2014, Plaintiff was housed in segregation at Menard and his correctional counselor was Mark Phoenix.   The counseling summary from that time period does not indicate that grievances were received from Plaintiff.   Nor is there any indication that Phoenix met with Plaintiff, in person, during that time period.

Plaintiff then testified about his grievances.   Plaintiff testified that while in segregation in February 2014 he was told by a female counselor to submit his grievances to her in writing.   Plaintiff testified that he had evidence to support his claim that he submitted grievances while in segregation at Menard that went unanswered.   Plaintiff

points to a postage voucher that he submitted on March 11, 2014 as evidence that he submitted emergency grievances to the warden.    Plaintiff also offers handwritten copies of those grievances attached to his complaint (Doc. 1-1, p. 14-22, 24).    While one of those grievances deals with mental health issues (Doc. 1-1, p. 24) the other grievance complains about the treatment he received on February 3, 2011 (Doc. 1-1, p. 14-22).    The postage voucher shows that he sent legal materials on March 11, 2014, the same day as the grievances in his complaint.    Plaintiff testified that the "purpose" portion of the voucher indicates that it was for two emergency grievances.    The undersigned notes that portion of the voucher is illegible (Doc. 1-1, p. 23).    Plaintiff explained that he only had a carbon copy of the voucher as the prison kept the original of the voucher which would clearly show the "purpose" line.    Plaintiff testified that he sought a copy of the original in discovery but was not provided a copy of the voucher.

Plaintiff further testified that he was told by his counselor to submit all of his grievances in writing.    He saw another counselor in March 2014 and asked about his grievances but the counselor told him she was only filling in for his permanent counselor and that he could talk to the counselor when the counselor returned from vacation. However, when the counselor returned, Plaintiff was told that he was being transferred to Pontiac.    Once he arrived at Pontiac, he submitted his grievance directly to the ARB.

As Plaintiff testified that the postage voucher demonstrated clear evidence that he submitted emergency grievances to the warden in a timely fashion and the "purpose" portion of that form was illegible, the Court directed defense counsel to obtain a copy of

the original voucher and submit it to the Court for review.   Defendants were given until June 30, 2016 to submit the exhibit.   On June 30, 2016, Defendants provided the Court with a copy of the original P96 postage voucher.   The voucher indicates that Plaintiff sought to mail 9 letters including two emergency grievances (Doc. 73-1).

### CONCLUSIONS OF LAW

Summary Judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [Defendants are] entitled to judgment as a matter of law." *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010).   Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA").   42 U.S.C. §1997e(a).   That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* (emphasis added).   The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement.   *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (noting that '[t]his circuit has taken a strict compliance approach to exhaustion"). Exhaustion must occur before the suit is filed.   *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004).   Plaintiff cannot file suit and then exhaust his administrative remedies while the suit is pending.   *Id.*   Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2005).   Consequently, if a

prisoner fails to properly utilize a prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted."   *Dole*, **438 F.3d at 809.**

Under *Pavey*, the Seventh Circuit held that "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge.   *Pavey v. Conley*, **544 F.3d 739, 740-41(7th Cir. 2008).**   Thus, where failure to exhaust administrative remedies is raised as an affirmative defense, the Court set forth the following recommendations:

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate.   (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over.   (3)If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies.

*Id*. at 742.

## A.  Exhaustion Requirements under Illinois Law

As an inmate confined within the Illinois Department of Corrections, Plaintiff was

required to follow the regulations contained in the Illinois Department of Correction's

Grievance Procedures for Offenders ("grievance procedures") to properly exhaust his

claims.   **20 Ill. Administrative Code §504.800** *et seq.*   The grievance procedures first

require inmates to speak with the counselor about their complaint.   **20 Ill. Admin. Code**

**§504.810(a).**   Then, if the counselor does not resolve the issue, the inmate must file a

grievance form directed to the Grievance Officer within 60 days of the incident.   ***Id.***

The grievance form must:

> contain factual details regarding each aspect of the offender's complaint,
> including what happened, when, where, and the name of each person who
> is subject of or who is otherwise involved in the complaint.   The provision
> does not preclude an offender from filing a grievance when the names of
> individuals are not known, but the offender must include as much
> descriptive information about the individual as possible.

**20 Ill. Admin. Code §504.810(a)(b).**   "The Grievance Officer shall [then] consider the

grievance and report his or her findings and recommendations in writing to the Chief

Administrative Officer...[who]shall advise the offender of the decision in writing within

2 months after receipt of the written grievance, where reasonably feasible under the

circumstances."   **20 Ill. Admin. Code §504.830(d).**   If the inmate is not satisfied with

the Chief Administrative Officer's response, he or she can file an appeal with the

Director through the Administrative Review Board ("ARB").   The grievance procedures

specifically state, "[i]f after receiving the response of the Chief Administrative Officer,

the offender still feels that the problem, complaint or grievance has not been resolved to

his or her satisfaction, he or she may appeal in writing to the Director within 30 days

after the date of the decision.   Copies of the Grievance Officer's report and the Chief Administrative Officer's decision should be attached."   **20 Ill. Admin. Code §504.850(a).**   "The Administrative Review Board shall submit to the Director a written report of its findings and recommendations."   **20 Ill. Admin. Code §504.850(e).**   "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance, where reasonably feasible under the circumstances.   The offender shall be sent a copy of the Director's decision."   **20 Ill. Admin. Code §504.850(f).**

The grievance procedures do allow for an inmate to file an emergency grievance. In order to file an emergency grievance, the inmate must forward the grievance directly to the Chief Administrative Officer ("CAO") who may "[determine] that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender" and thus the grievance should be handled on an emergency basis.   **20 Ill. Admin. Code §504.840(a).**   If an inmate forwards the grievance to the CAO as an emergency grievance, then the CAO "shall expedite processing of the grievance and respond to the offender" indicating to him which course he has decided is necessary after reading the grievance.   **20 Ill. Admin. Code §504.840(b).**   Once the CAO has informed the inmate of his decision, the inmate may then appeal that decision to the ARB on an expedited basis.   **20 Ill. Admin. Code §504.850(g).**

## B.  Analysis

Defendants Wexford and Trost argue that none of the documentation in the

record supports Plaintiff's claim that he sought to submit grievances at the institutional level.   If the Court believes that Plaintiff sought to grieve his claims against Wexford and Trost while at Menard but those grievances were never returned to him, then his attempts at exhaustion would be deemed thwarted and he may proceed with his lawsuit.  *See Walker v. Sheahan*, **526 F.3d 973, 979 (7th Cir. 2000) (an inmate is not required to appeal his grievance if he submits the grievance to the proper authorities but never receives a response);** *Dole v. Chandler*, **438 F.3d 804, 809 (7th Cir. 2006) (a remedy can be unavailable to a prisoner if the prison does not respond to the grievance or uses misconduct to prevent a prisoner from exhausting his resources);** *Brown v. Darnold*, **2010 WL 3702373, at *3 (S.D. Ill. 2010) ("The Seventh Circuit has held that administrative remedies become 'unavailable' when prison officials fail to respond to inmate grievances." (quoting** *Lewis v. Washington*, **300 F.3d 829, 833 (7th Cir. 2002)).**

Here, the Court finds Plaintiff's testimony that he tried to submit grievances while still at Menard to be credible.  Plaintiff testified that he submitted grievances while he was at Menard, both in February and March.  Plaintiff's response brief indicates that he filed two grievances in February regarding treatment for his injuries, one dated February 14, 2014 and the other dated February 20, 2014.   Handwritten copies of those grievances were attached to Plaintiff's complaint (Doc. 1-1, p. 3-12).   The February 14, 2014 grievance was marked as an emergency.  When Plaintiff did not receive a response to those grievances, he sought to file a copy of the February 20, 2014

grievance as an emergency with the warden. That grievance was dated March 11, 2014 and is nearly identical to his February 20, 2014 grievance except it is marked as an emergency (Doc. 1-1, p. 14). Plaintiff testified that he submitted this grievance through the U.S. Postal and includes in his complaint a postage voucher for the grievance (Doc. 1-1, p. 23). While the "purpose" portion of the postage voucher that Plaintiff attached is illegible, the Court ordered production of original voucher which was submitted on June 30, 2016 (Doc. 73-1). That voucher indicates that two emergency grievances were mailed out by Plaintiff (Id.). The original voucher matches up with Plaintiff's testimony regarding the contents of the package mailed by Plaintiff and the Court finds Plaintiff's testimony that it was two emergency grievances credible. Thus, the Court finds Plaintiff's testimony that he sought to submit grievances that were never returned to him credible, as his testimony is supported by copies of the grievances and the postage receipt showing that he sought to submit the grievances. The evidence supports Plaintiff's claim that he sought to grieve his complaints with his healthcare through the proper channels but those grievances were never responded to.

Defendants argue that there is no documentation in the record to support Plaintiff's claim that he sought to submit his grievances while at Menard. The postage voucher, however, is some evidence of Plaintiff's testimony that he submitted grievances that were never returned to him. While Defendants point out the cumulative counseling summary does not indicate that Plaintiff's grievances were filed, the Court notes that the dates Defendants point to are irrelevant. Defendants point out that

Plaintiff had submitted grievances in the past that were received, noting an entry from October 18, 2012 which shows that Plaintiff was given two grievances.  However, the undersigned finds this entry irrelevant as the entry is from 2012, before Plaintiff was placed in segregation in Menard, so it is not during the relevant time period and the entry appears to indicate that Plaintiff was provided with two grievances at that time, meaning that he was given blank grievances from his counselor.  Further, Defendants have failed to provide the Court with Menard's grievance records or emergency grievance log which would indicate whether the emergency grievances that Plaintiff testified he sent through the postage were received by the warden.  Emergency grievances are logged on the emergency grievance log and sometimes on the grievance log if reviewed by the grievance officer.  Without these records, it is not clear to the Court that the grievances were not received by the warden for review.   As the burden lies with Defendants to show that Plaintiff has failed to exhaust his administrative remedies, the undersigned finds that the Defendants have failed to meet this burden, failing to show that Plaintiff did not submit his grievances as he testified he did. Accordingly, the undersigned **RECOMMENDS** that the Court **DENY** Defendants' motion for summary judgment on the basis of administrative exhaustion.

### CONCLUSION AND RECOMMENDATIONS

In closing the undersigned **RECOMMENDS** that the Court **DENY** the summary judgment motion filed by Defendant Trost and Wexford Health Sources, Inc. (Docs. 60 and 61).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation.   The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals.   *See, e.g., Snyder v. Nolen*, 380 F.3d 279, 284 (7th Cir. 2004).   Accordingly, Objections to this Report and Recommendation must be filed on or before **July 18, 2016**.

**IT IS SO ORDERED**.
DATED:   July 1, 2016.

/s/ Stephen C. Williams
STEPHEN C. WILLIAMS
United States Magistrate Judge